IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PATRICK T. SMITH, | |
| Plaintiff, | **8:18CV491** |
| vs. | |
| ANDREW SAUL,[1] Commissioner of Social Security; | **MEMORANDUM AND ORDER** |
| Defendant. | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Patrick Smith appeals a final determination of the Commissioner which denied his application for Social Security benefits. This Court has jurisdiction under 42 U.S.C. § 405(g).

## I. BACKGROUND

### A. Procedural History and Introductory Information

On June 26, 2015, plaintiff Patrick T. Smith filed an application for disability benefits. He alleged that he suffered from a disability that began on October 31, 2013. Filing No. 8-2, Social Security Transcript ("Tr. 1") at 13. Smith's application was denied initially and upon reconsideration. Filing No. 8-3 at 77, 89. Following a July 21, 2017, hearing, an administrative law judge ("ALJ") denied benefits. Filing No. 8-2 at 22, 28-67. On August 15, 2018, the Appeals Council denied review, and the ALJ's decision stands

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019, for a six-year term that expires on January 19, 2025. He is substituted for Carolyn W. Colvin, former Commissioner, and/or Nancy A. Berryhill, former acting Commissioner, as Defendant.

as the final decision of the Commissioner.  *Id.* at 1-6.  Smith seeks review of the ALJ's order denying benefits.  Filing No. 1, Complaint at 1.

Patrick Smith is now fifty-three years old.  Filing No. 8-6 at 184.  He has previous relevant work experience as a fraud agent, expense clerk, and document preparer.  Filing No. 8-2 at 20.[2]  Smith has at least a high school education and can communicate in English.  *Id.* at 21.[3]  His most recent full-time employment position was as a merchant fraud agent at PayPal Inc. ("PayPal"), which culminated in October of 2013.  Filing Nos. 8-3 and 8-5 at 88, 187, 195.[4]  At the time of Smith's application for benefits, he contended that he was unable to work because of scoliosis, back problems, neurofibromatosis, deteriorated vertebrae, headaches, weakness in both knees, and status post ten back surgeries.  Filing No. 8-3 at 68-69.

### B.  Claimant's Relevant Testimony at the ALJ Hearing

Smith testified that he was born on March 28, 1966 and was fifty-one years old at the time of the hearing.  Filing No. 8-2 at 34.  He provided his residential address and stated that it was a house with a main floor, an upstairs, and a basement.  *Id.* at 34-35. The ALJ inquired as to whether Smith's back condition caused difficulty navigating between the floors of his home, and Smith responded that he just moved into his home and that he walked a great deal the day prior as he directed movers where to put items, which "[gave him] some difficulty yesterday."  *Id.* at 35.  The ALJ asked Smith if he considered, preceding the move, the difficulties that accompanied life in a three-level

---

[2] Even though it was a temporary position, the vocational expert who testified at the hearing added "mailroom clerk" to Smith's past relevant work because "[Smith] performed it long enough to have learned the [job]."  Filing No. 8-2 at 57.

[3] In his disability report, Smith disclosed that he completed four or more years of college in 2001.  However, the record as a whole is highly equivocal concerning Smith's post-high school education.  *See* Filing No. 8-7 at 210.

[4] Smith's 2014 income of $9,104.83 was from medical leave earnings.  Filing Nos. 8-6 and 8-7 at 190, 195.

home.  *Id.*  Smith answered that his old home had three floors as well, and that he spent the majority of his time on the main level.  *Id.*  As such, Smith stated that he did not consider the difficulties his new residence presented, and that he planned to maintain his presence, for the most part, on one of the three floors of the new home.  *Id.*

Smith affirmed that he lived with his wife and the couple's two young daughters, aged ten and twelve.  *Id.*  He confirmed that he drove himself to the hearing, and that he possessed a valid driver's license with no restrictions.  *Id.* at 35-36.  Smith testified that he drove his daughters to and from school during the academic year and that he drove to church services on occasion.  *Id.* at 36.  The ALJ asked Smith if he shopped, or went to the grocery store, or ran errands, and Smith responded that his daughters helped him when he went to the grocery store (they placed items in the cart and transported things from the car into the house).  *Id.*

The ALJ asked Smith whether he used alcohol or street drugs, and Smith estimated that he had not consumed any alcohol for three or four months because of medication.  *Id.*  He stated that he had "maybe one beer four months ago, three and a half months ago," and testified that, even when he was not on medication, he seldom consumed alcohol.  *Id.*

Smith stated that he was right-handed and affirmed that he underwent a trigger release surgery in April [of 2017] on his right middle finger.  *Id.*  at 36-37.  Smith declared that he "still [had] problems with [his right middle finger], to [that] date."  *Id.* at 37.  The ALJ asked Smith about his prognosis after the surgery, and Smith replied that he recently saw Dr. Thompson, the physician who performed the trigger release surgery, and that Dr. Thompson provided an injection.  *Id.*  Smith further testified that his hand remained sore

at the time of the hearing, and that he tried to remedy the pain via ligament stretches, as he did not want to have another injection. *Id.* He affirmed that the ligament stretches he performed were not part of physical therapy and that they were hand motions and exercises that Dr. Thompson showed him how to do. *Id.* The ALJ questioned Smith regarding the frequency of the hand stretches, and Smith stated that he conducted the exercises as needed when his hand bothered him, which as of late was once per day, in the morning. *Id.*

Smith acknowledged that his alleged onset date was October 31, 2013, the date of his surgery, and that he had not worked since that date. *Id.* at 37-38. He testified that he worked as a fraud agent at PayPal from December 7, 2007, until two days preceding the October 31, 2013, surgery (i.e., October 29, 2013), and that he never returned to work subsequent the surgery. *Id.* at 38. Smith further testified that PayPal held his position open for six months, after which timeframe the Human Resources department said that his job was in the process of termination, but that he was eligible for rehire. *Id.* Smith stated that he was on short-term disability with PayPal because he thought that he would return to work within three months of the surgery, but he was unable. *Id.* Smith stated that he worked as an account clerk with Woodman Life Insurance from May of 1991 until January of 2004, and that he quit because he did not receive the raises he felt he deserved. *Id.* at 39. After Woodman Life Insurance, Smith testified that he worked for Celebrity Staffing, a temp agency. *Id.* Celebrity Staffing placed him at Aria Staffing, where he recorded and copied documents for eight hours per day for approximately two months. *Id.* Smith was then placed at Galva, where he worked in the mailroom for an unspecified duration, after which he was a stay-at-home dad. *Id.*

Smith testified that he neither worked nor applied for work since 2013.  *Id.* at 39-40.  He insisted that this was due to his inability to sit for long periods of time.  *Id.* at 40.  Smith stated that his only source of income was from the sale of items on eBay, but that such sales "[did not] pay the bills [and were] just more of a hobby."  *Id.*  At the time of the hearing, Smith's wife was his sole financial support.  *Id.*

The ALJ noted that, since the October 31, 2013 surgery, Smith had MRIs and x-rays, and that such procedures indicated that the progression of Smith's healing "seemed to be going well," yet the record indicated continual pain.  *Id.*  As such, the ALJ asked Smith to describe his experiences of pain.  *Id.*  Smith testified that he had nerve pain in two different spots within his back.  *Id.*  He had three injections at the Nebraska Spine Center in the lower right corner of his back, above his waist, and those provided minimal relief for approximately one month.  *Id.*  Smith further testified that he took three medications for pain relief, and that he was on those medications for the preceding three and a half years.  *Id.* at 41.  He stated that he was on numerous medications following the October 31, 2013, surgery, and that he still experienced back pain as of the hearing date.  *Id.*  Smith testified that the pain never migrated or progressed, and that it had always remained in the same location since the surgery.  *Id.*

Smith stated that he sought physical therapy and aqua therapy treatments in 2015, 2016, and 2017, but those treatments provided "no end to the discomfort and the pain" that he continued to experience in the lower right corner of his back.  *Id.*  The ALJ asked Smith to confirm that the treatments did not provide "any . . . benefit at all," and Smith responded: "None."  *Id.*

Smith then described the condition of his lower left back.  *Id.* at 41-43.  He testified that he had surgery on July 1, 2017, as a result of a neurofibroma physical therapy exercise in his lower left back.  *Id.* at 41-42.  Smith stated that he performed a physical therapy exercise in which he rolled over and stretched his right arm to his back.  *Id.* at 42.  He testified that this exercise ruptured a blood vessel, which consequently created a large hematoma, which resulted in emergency surgery.  *Id.* at 42.  He stated that the July 1, 2017, surgery closed the vessel that caused internal bleeding and removed "all the fluid" referenced in the attorney's opening statement.  *Id.*  Smith maintained that he had a drain tube removed on July 19, 2017, which was the Wednesday prior the hearing.  *Id.* at 42.  The ALJ questioned Smith regarding the prognosis of the hematoma surgery, and Smith said that he remained sore and that he needed "to take it easy and not do a whole lot, for the fear of maybe rupturing that vessel again."  *Id.* at 43.

Smith testified that the hematoma surgery and resulting pain were "a side issue from the nerve pain."  *Id.*  Regarding management of the persistent nerve pain in his lower right back, Smith stated that, as of the hearing date, he had not received "any answers as to the best recommended approach."  *Id.*  Smith also acknowledged pain in the middle of his left back but stated that such pain was "not as consistent as the pain on the lower right."  *Id.*

The ALJ asked whether the nerve pain came and went or was constant.  *Id.*  In response, Smith testified:

> Depending upon how long I sit in chairs or my movements – you know, if I – I tried to do some yardwork this spring, and I couldn't even – was not able to move – or, excuse me, not able to mow our front yard because of the nerve pain.  So, I'm not even able to mow due to that, and I can't sit –

*Id.* at 43-44. Smith further testified that, after the 2013 surgery, he did not attempt yard work until 2016. *Id.* at 44. The pain in 2017, however, was "much more intense." *Id.* Smith described a recent incident wherein he started to mow but intense pain caused him to stop; his wife had to take over and complete the task. *Id.* Smith stated that he had not attempted to mow since early spring of 2017. *Id.*

Smith explained that the nerve pain in his back, not the neurofibromatosis, prevented him from sitting or standing for long periods of time. *Id.* The neurofibromatosis, Smith testified, caused "a different type of discomfort" in addition to the back pain he experienced. *Id.* He stated that neurofibromatosis resulted in a recent facial surgery on the left side of his nose and in between his eyes. *Id.* Smith specified that if neurofibromatosis "hit in a certain way," then blood vessels would rupture, so he needed surgery because he was at risk for a potential blood vessel rupture, which could result in loss of sight in his left eye. *Id.* at 45. The ALJ asked if the neurofibromatosis surgery was successful, and Smith replied:

> [The doctors were only able to] resect so much at a time. My understanding is there is a major blood vessel near that left eye, and if they go in there and try to remove too much, it – it's in additional danger of excess bleeding . . . it could possibly return. On my left side, here, I have a bulge, and this is the denervation injury . . . with neurofibromatosis, there's excess nerves with these growths, and at one point where I had a back surgery, some of those nerves were severed.

*Id.* at 45. Smith further testified that he visited Dr. McNamara regarding the possibility that this condition could be fixed or repaired, or maybe have the muscle removed, but that there was "nothing that [could] possibly be done to repair those nerves or repair that damage that was done." *Id.*

The ALJ asked if neurofibromatosis caused Smith any limitations; he inquired whether, besides the bulge on Smith's side, neurofibromatosis impacted him at all. *Id.* at

46. Smith stated that his only choices were limited to sitting at a desk. *Id.* He testified that he was unable to perform any sort of construction work or anything that could possibly further damage the afflicted area of his body. *Id.* Smith affirmed that he could not do anything active or that included heavy lifting–anything that could cause a rupture or contribute to his "all-encompassing" back problems. *Id.* He testified that he could not lift more than fifteen to twenty pounds and that he could not perform a job that required him to sit at a desk for eight hours per day. *Id.* at 47.

The ALJ asked Smith to explain why he would be precluded from such a workday, and Smith replied that he could not sit at a desk for eight hours because of the nerve pain that he experienced since the October 31, 2013, back surgery. *Id.* The ALJ reiterated his question; he asked Smith to describe some of the impact of the nerve pain and why it would prevent him from work at an eight-hour job. *Id.* Smith stated that the longer he sat, the more intense the nerve pain became. *Id.* He further testified that pain medication was largely ineffective and did little to alleviate the intense pain. *Id.* In response to the ALJ's contention that perhaps Smith had prescriptions for pain medications that he did not take, Smith declared that past prescriptions for hydrocodone did little to remedy pain, and while he was on Lyrica, it too had only minimal effect. *Id.* The ALJ asked Smith to elaborate upon the term "minimal effect," so Smith stated that Lyrica provided approximately four to five hours of relief. *Id.* Lyrica was one of the medications Smith took to help him sleep, but the pain at night still kept him from attaining a restful night of sleep. *Id.*

Smith testified that he experienced symptoms of fatigue throughout the day. *Id.* at 48. He estimated that he napped four to five times per week, for anywhere from forty-five

minutes to a couple of hours. *Id.* The ALJ asked Smith to discuss how prolonged sitting made the pain more intense. *Id.* Smith said that sometimes after only an hour of sitting he had "to go lay down or go to bed and just try and rest in bed." *Id.* He further testified that his pain level depended upon how active he was, and that his pain was aggravated when he ran errands with his daughters or took them to school. *Id.* at 49. Smith estimated that he could drive or sit in a car for two-and-a-half hours, and that during that period he would stop and get out of the car to move around, stretch his legs. *Id.*

Smith stated that he received no assistance with his personal care–he groomed, bathed, and shaved himself independently. *Id.* In terms of household chores, Smith testified that he did dishes, but that his wife and daughters vacuumed. *Id.* at 49-50. He stated that majority of his days were spent watching television, and that he spent about ten minutes per day on the computer. *Id.* at 48, 50. Smith testified that he read books on occasion. *Id.*

Smith's attorney then questioned him. *Id.* at 48-55. Smith testified that he took two-and-a-half-hour car trips roughly twice per year, and that he got out of the car to move around at least once during a trip of such a duration. *Id.* at 50. Typically, when he arrived at his destination, Smith stated that he sat down and relaxed because sitting in the car for that long bothered his back. *Id.* at 51.

Smith acknowledged that his daily prolonged sitting was on a comfortable couch, and that he could continuously sit in an office chair for no more than an hour. *Id.* He testified that he did not believe he could "alternate positions all day long" because prolonged sitting or standing irritated his nerves. *Id.* Smith stated that when he got up and stood at his house, he moved around – for example, he got a drink or went to the

bathroom.  *Id.*  He got up and moved around for no more than five to ten minutes, at which point he needed to either sit back down or take a nap.  *Id.* at 51-52.  Smith testified that he took naps because his persistent nerve pain felt better when he laid down, but also because he did not sleep restfully at night and was consequently tired most days.  *Id.* at 52.[5]

Smith testified that sitting for too long negatively impacted his concentration and attention, but that he felt better after he took a nap.  *Id.* at 52-53.  Smith affirmed that Dr. Woodward, his surgeon for the 2013 back surgery, recommended that he contact Social Security.  *Id.* at 53.  The attorney asked Smith if he had a bone stimulator, and Smith responded that he had a bone neurostimulator.  *Id.*  Smith described the neurostimulator:

> It's a device – it kind of has a ring in the front, and one – a ring in the back, and it Velcros, and it runs on an electric charge.  There's an internal battery, and it – well – and what I believe it – with – from what I remember, what I was told, it sends electrical impulses from back to front to help promote bone growth.

*Id.*  The attorney asked if Smith used the bone growth stimulator beginning in May of 2015, and Smith replied that he could not recall the specific dates when he used the device.  *Id.*  Smith testified that he used the bone stimulator twice per day, for sixty minutes each time, for about five months.  *Id.* at 54.

Smith further testified that the severity of his pain depended on the type of chair, and that he was limited to sitting for fifteen to twenty minutes if it was a hard surface chair.  *Id.*  Smith remarked that such chairs caused discomfort, and that standing (for example, earlier during the hearing) alleviated some of the discomfort that resulted from sitting continuously.  *Id.*  He stated that he thought standing relieved the discomfort because it took away some of the pressure from his back.  *Id.*  Smith reaffirmed that he could sit in

---

[5] At this point of the hearing, the ALJ granted Smith permission to stand up.

a chair such as the one he sat in at the hearing for no more than twenty to twenty-five minutes because sitting irritated the nerves in his back. *Id.* He confirmed that he could sit on a couch at home for an hour, but that he could sit in the chair at the hearing for no more than twenty minutes. *Id.* at 55. Smith declared that when he worked at PayPal, he had an "office chair on wheels, with the approximate thickness of padding." *Id.*

### C. Claimant's Relevant Medical History

On May 21, 2013, Smith presented at Nebraska Spine Center, LLP, where Dr. H.R. Woodward, MD, evaluated him for lower back pain and pain between his shoulder blades. Filing No. 8-9 at 307. The medical record reflects Smith was a 47-year-old male, post Harrington rod procedure (T8-L4) and post multiple surgeries for neurofibromas. The structural diagnosis additionally included degenerative disc disease L4-S1, advanced dural ectasia T8-L4, history of L5-S1 disc protrusion, status post recent fibroma excision left flank and saggital coronal imbalance. *Id.* at 310. Dr. Woodward noted that Smith's pain was a burning, dull, aching, sharp, pins and needles sensation was relieved by lying down, and worsened with sitting, walking, or prolonged positions. *Id.* at 307. Dr. Woodward stated that Smith could not stand or walk for more than fifteen minutes before he had to stop, and that he could not participate in activities (e.g., mowing the lawn) for more than fifteen minutes before pain forced him to stop and rest. *Id.* Dr. Woodward further declared that Smith had mild pain along his left lateral thigh, and he noted that Smith expressed concern that he leaned forward more than normal. *Id.* Additionally, Dr. Woodward stated that Smith visited the Nebraska Spine Center approximately two years prior to the May 21, 2013, appointment, and received prescriptions for Medrol Dosepak and Indomethacin, but these medications caused gastrointestinal problems. *Id.*

Dr. Woodward stated that Smith "continue[d] to have the same basic problems he has had previously with advanced neurofibromatosis and dural ectasia along the fused levels with a flat spine along the fusion area, along with symptomatic degeneration of the lumbosacral spine resulting in coronal and sagittal imbalance."[6] Filing No. 8-9 at 310. Dr. Woodward thought that treatment "would be relatively straight-forward with an anterior and posterior extension of the fusion to the sacrum with rebalancing the spine," but that such a procedure would be "significantly complicated" for Smith because he had extensive dural ectasia and neurofibromatosis. *Id.* at 311. Dr. Woodward noted that "bleeding would be significantly increased with this procedure and fixation in the spine above L4 would be very tenuous," and that since the fusion was limited, "any change in this may cause severe complications if the fusion [was] disrupted." *Id.*

On June 11, 2013, Smith returned to Dr. Woodward to follow-up regarding an MRI of his lumbar spine. *Id.* at 312. Smith described lower back pain and pain in his "left lower extremity, distally to the knee." *Id.* Smith characterized both his back and leg pain severity as a three out of ten, and described the pain as dull, aching, and burning with a sharp shooting sensation. *Id.* Smith stated that nothing improved the pain, that it worsened when he laid on a hard surface, and he complained of slight dizziness. *Id.* Dr. Woodward noted that the MRI revealed "degenerative changes present at L5-SI with

---

[6] The nervous system is surrounded by a fluid contained in a membrane called the dura, made up primarily of connective tissue; the enlargement of this membrane is referred to as dural ectasia. Symptoms of dural ectasia include aching in the lower back, abdominal pain, headaches, leg pain, and pain and numbness in the perineum. *See Nervous System*, THE MARFAN FOUNDATION, https://www.marfan.org/about/body-systems/nervous-system (last visited June 26, 2019). In addition to dural ectasia, Smith dealt with neurofibromatosis, a genetic disorder that causes tumors to form on nerve tissue throughout the nervous system. Neurofibromatosis symptoms include hearing loss, learning impairment, cardiovascular problems, vision loss, and severe pain. *See Neurofibromatosis*, MAYO CLINIC, https:www.mayclinic.org/diseases-conditions/neurofibromatosis/symptoms-casues/syc-20350490 (last visited June 26, 2019).

moderate bilateral foraminal stenosis noted and right sided disc protrusion." *Id.* at 315.

Dr. Woodward prescribed Flexeril, a muscle relaxant, to be taken at nighttime. *Id.*

Smith, together with his wife, saw Dr. Woodward again on September 3, 2013, to discuss surgical options. *Id.* at 316. Smith complained of pain in his lower back "with numbness into the left lower extremity distally to the foot and toes." *Id.* Dr. Woodward noted that Smith had a "jumper's stance" and accompanying discomfort in his upper thoracic spine. *Id.* Smith described his pain as dull, aching, tingling, and rated the pain severity at a four out of ten. *Id.* Dr. Woodward further noted that Smith's pain worsened with prolonged walking or standing and resting brought only mild relief. *Id.* As of this visit, Smith was prescribed Cyclobenzaprine HCl, up to 15 mg daily, and Indomethacin ER 75 mg daily. *Id.* Dr. Woodard ordered radiographs of Smith's entire spine, and thereafter provided the following observation:

> There is a Harrington distraction rod from T8 through L4 with good bone graft noted in the concavity of the thoracolumbar curve. There is a residual right thoracic scoliosis 24 degrees and left thoracolumbar scoliosis 32 degrees with a small fractional lumbosacral curve. The left lower extremity is 6 mm short and the left shoulder is elevated 2 cm. Radiographic plumb line falls 8 cm to the right. The lateral view shows the area along the Harrington rod is flat with an increased thoracic kyphosis just above the fusion level and overall there is a long thoracolumbar kyphosis 33 degrees and a short lumbar lordosis 29 degrees. There is severe loss of disc space height at L5-S1 and he is 8 cm out of balance anteriorly.

*Id.* at 318. Dr. Woodward reviewed the x-rays with the Smiths and proposed an anterior and posterior spinal fusion surgery, a detailed procedure he discussed with the couple, who elected to proceed. *See id.* at 319.

Dr. Woodward evaluated Smith at a pre-surgical conference on October 22, 2013. *Id.* at 321. Smith complained of dull, aching pain in his mid and lower back, left leg weakness, and numbness of the anterior left thigh. *Id.* Dr. Woodward noted that Smith's

pain was gradually worsening. *Id.* Dr. Woodward further noted that Smith reported that he had more symptoms in his anterior left thigh and continued to have discomfort in his lower extremity and right buttock, that his walking distance decreased, his forward flexed "jumper's stance" increased, and that he was anxious to proceed with surgery. *Id.* at 323. Dr. Woodward described the surgery as "an anterior L4-5 and L5-SI disc excision and interbody fusion using homologous bank structural bone and application of an anterior plate at both levels if possible from the left retroperitoneal approach," and further outlined the procedure, scheduled for October 31, 2013, with Smith. *See id.*

On October 25, 2013, Smith presented at Indian Hills Physicians Clinic before his primary physician, Dr. Edward J. Taylor, MD. Filing No. 9-2, Social Security Transcript ("Tr. 2") at 552. Dr. Taylor noted that Smith had "continued substantial discomfort in his low back," in addition to a "marked degree of scoliosis" and "a continued bent forward position" and left leg numbness. *Id.* Dr. Taylor noted that Smith felt he had no choice but to undergo an "anterior fusion with posterior decompression of the spine as well as straightening" to remedy his severe pain. *Id.* Dr. Taylor prescribed cyclobenzaprine 5 mg daily. *Id.* at 560.

Smith underwent back surgery conducted by Dr. Woodward and co-surgeon Dr. Tom White, MD, at Nebraska Spine Center, LLP, on October 31, 2013. Filing No. 8-9 at 327. The surgery was divided into two stages and took eight hours and sixteen minutes. *Id.* Stage one was a disc incision, an interbody fusion, and the placement of patellar implants, all "via a left retroperitoneal approach which was difficult due to the previous operative approach to this area as well as unusual vascular pattern and the neurofibroma tissue." *Id.* Stage two was the completion of a spinal fusion with screws, rod placement,

bone graft. *Id.*[7] Dr. Woodward noted that the surgery was "more complex and took longer due to [Smith's] extensive previous surgery and the neurofibromatosis tissue that was quite vascular and difficult to stop bleeding." *Id.* Dr. Woodward stated that Smith tolerated the extensive procedure satisfactorily. *Id.*[8]

On November 19, 2013, Smith saw Dr. Taylor for a post-hospitalization check. Filing No. 9-2 at 542. Dr. Taylor noted that Smith underwent a "major spine fusion procedure," and a "fairly prolonged" thirteen-day hospitalization followed. *Id.* Dr. Taylor noted Smith's cyclobenzaprine 5 mg prescription and additionally prescribed omeprazole 40 mg daily for thirty days, hydrocodone-acetaminophen 5-325 mg two tabs every four to six hours, and diazepam 5 mg daily for thirty days. *Id.* at 547.

On November 26, 2013, Smith presented before Dr. Woodward for a postoperative follow-up approximately one month subsequent his L4-SI spinal fusion surgery. Filing No. 8-9 at 328. Smith stated that he had pain in his lower back, pain in his left groin, swelling in his left testicle, his right thigh felt tight, and his right leg was weak. *Id.* Dr. Woodward's notes indicated that Smith's recovery progressed "fairly well following his somewhat prolonged postoperative ileus and bladder problems." *Id.* at 331. He noted some fluctuance along Smith's incision and speculated that his left anterior thigh and inguinal discomfort were due to the surgical dissection for the anterior procedure. *Id.* Dr. Woodward further stated that Smith continued to complain of anterior thigh discomfort "possibly due to an intraoperative hematoma from pressure or needle . . ." *Id.* Dr.

---

[7] Dr. Woodward's October 31, 2013, surgery notes provide more detailed explanations of stages one and two. *See* Filing No. 8-9 at 327.

[8] The medical record indicates that Smith was hospitalized for nearly two weeks following the October 31, 2013, surgery; he was discharged on November 12, 2013. *See* Filing No. 9-1 at 474.

Woodward prescribed Vistaril, up to 100 mg per day for fourteen days, and Hydrocodone-Acetaminophen 5-325 mg, up to six times per day for eight days. *Id.*

Dr. Woodward referred Smith to Ms. Amy Garrett, PT, for physical therapy at the Nebraska Spine Center, and Smith saw Ms. Garrett for a physical therapy evaluation and treatment on December 10, 2013. *Id.* at 333. Ms. Garrett noted that Smith reported a "pins and needles" sensation and hypersensitivity along his medial ankle up the anteromedial lower leg. *Id.* Smith further described discomfort in his lower back, at the waistline and into his right buttock. *Id.* Smith rated his pain severity a two out of ten, and disclosed that he took Hydrocodone to alleviate pain every four hours. *Id.* Ms. Garrett instructed Smith in in-home exercises to remedy his decreased neuro-mobility, right leg weakness, and weakness in his abdominal musculature. *Id.* at 336.

Also, on December 10, 2013, Smith returned to Dr. Woodward for a six-week post-operative follow-up evaluation. *Id.* at 337. Dr. Woodward noted Smith's increased lower back and right buttock pain and a pins and needles sensation over his right medial calf and stated that the pain worsened over the prior week, particularly when Smith rose from a chair or got up from lying down. *Id.* Dr. Woodward further noted that, on exam, Smith had "a slightly decreased right patellar reflex." *Id.* at 339. As of this appointment, Smith was prescribed Cyclobenzaprine HCl (Flexeril), up to 30 mg daily for fifteen days, Hydrocodone-Acetaminophen 5-325 mg, up to twelve times daily for ten days, and Hydroxyzine HCl 25 mg. *Id.* at 337.

Smith reported pain in his right anterior thigh and medial right ankle when he followed up with Dr. Woodward again on January 3, 2014. *Id.* at 341. Dr. Woodward noted that the pain was burning, sharp, and tingling, and worsened when Smith arose

from a chair, changed positions, or got out of bed. *Id.* Dr. Woodward prescribed Cyclobenzaprine HCl 10 mg for sixteen days, Diazepam 2 mg for thirty days, Gabapentin 900 mg daily for thirty days, Hydrocodone-Acetaminophen 5-325 mg, up to twelve times daily for ten days, and Hydroxyzine 25 mg for twelve days. *Id.*

Smith returned to Dr. Woodward on January 21, 2014, and he once again reported sharp right lower back pain, which radiated into the right anterior thigh. *Id.* at 347. Dr. Woodward noted that Smith's back pain worsened when he arose from bed or the recliner. *Id.* Smith stated that the surgery failed to resolve his preoperative left lower extremity pain and difficulty walking. *Id.* Dr. Woodward further noted that previously-prescribed Gabapentin somewhat improved, but did not resolve, the numbness and tingling in Smith's right shin. *Id.* Dr. Woodward had Smith's lumbosacral support brace adjusted and refilled his Hydrocodone prescription. *Id.* at 350.

Also, on January 21, 2014, Smith returned to Ms. Garrett for physical therapy. *Id.* at 351. Smith reported "pins and needles" in his right anteromedial lower leg. *Id.* Smith further stated that he needed a pole to get out of bed and that he could not stand up straight to walk to the bathroom. *Id.* Ms. Garrett noted that Smith experienced discomfort when he arose from bed or a chair, and that Smith characterized his pain as "severe," often at a severity level of eight or nine out of ten at all times during the day. *Id.* At the time of the appointment, Smith's pain severity was a four or five out of ten. *Id.* Ms. Garrett noted that Smith spent entire days lying in bed, that he had "pain attacks" when he moved from sitting to standing, that he wore his back brace as instructed, and that he continued to take Hydrocodone. *Id.* Ms. Garrett instructed Smith in exercises to increase strength, flexibility, stability, range of motion, balance, and posture, and strongly encouraged him

to increase his daily activity in small amounts (e.g., five minutes of walking on a treadmill on level ground).  *Id.* at 353.

On February 19, 2014, Smith presented before Dr. Taylor for a three-month post-operative spinal fusion evaluation.  Filing No. 9-2 at 536.  Dr. Taylor noted that Smith had difficulty bending and stooping.  *Id.*  Smith described tingling in the L-3 distribution of the right thigh (treated with gabapentin) and stated that he took hydrocodone every six hours because of increased pain (particularly at night).  *Id.*

On March 4, 2014, Smith presented at the Nebraska Spine Center to see Liane E. Donovan, MD, because his persistent lower back pain "failed to respond to conservative non-interventional treatment."  Filing No. 8-9 at 358.  In an attempt to alleviate Smith's chronic pain, Dr. Donovan administered a "right iliac screw head injection" – a shot of Depo-Medrol 40 mg and .25 percent bupivacaine 2 cc.  *Id.*[9]  Smith also saw Dr. Woodward for a four-month post-operative evaluation on March 4, 2014.  *Id.* at 359.  Smith described his pain, which worsened especially when he repositioned in bed, as a sharp sensation in his lower back, right buttock, and hip area, and he rated his pain severity at a two out of ten.  *Id.*  Smith's active prescription medications were Cyclobenzaprine HCl 10 mg for sixteen days, Diazepam 2 mg for thirty days, EQL Senna-S 8.6-50 mg daily for thirty days, Gabapentin 900 mg daily for thirty days, and Hydrocodone-Acetaminophen 5-325 mg, up to four times daily for twelve days.  *Id.*

On April 25, 2014, Dr. Woodward evaluated Smith for a six-month post-operative follow-up exam.  *Id.* at 367.  Smith presented with complaints of right lower back pain that radiated to the right buttock and hip.  *Id.*  Dr. Woodward noted that Smith did not have

---

[9] Smith returned to Dr. Donovan on April 1, 2014 and received another of the same injection for continual pain management.  *See* Filing No. 8-9 at 365.

lower extremity pain except for discomfort behind his left knee which occurred when he slept. *Id.* Smith stated that his back pain was particularly bad when he slept, that he could not move around in bed, and that he endured significant pain after he sat for more than fifteen to twenty minutes. *Id.* Additionally, Smith asserted that his sharp pain level remained unchanged despite medications and injections. *Id.* Dr. Woodward prescribed Cyclobenzaprine HCl 10 mg for sixteen days and Tramadol HCl up to 300 mg daily for ten days. *Id.* Dr. Woodward stated that Smith's L4-5 interbody fusion (and the facet joints posteriorly at L4-5 where the fusion was not solid) were not as advanced as at L5-SI, and that it probably had not yet completely healed. *Id.* at 369.[10]

On May 20, 2014, Smith returned to Dr. Taylor for medication management following "a previous substantial correction regarding his kyphoscoliosis of the spine through Dr. Woodward." Filing No. 9-2 at 528. Dr. Edwards noted that Smith had "a pin which apparently [was] nerve impinging which [was] being possibly considered for potential screw removal," and that Smith's activities were "very limited." *Id.* Dr. Taylor prescribed cyclobenzaprine 5 mg daily for forty-two days. *Id.* at 533.

On August 22, 2014, Smith visited Dr. Woodward after he used an external bone growth stimulator for approximately three months. Filing No. 8-9 at 371. Smith still complained of right lower back pain that radiated to the right buttock and hip. *Id.* Smith stated that the pain was most severe when he changed positions or remained in one position for a prolonged duration. *Id.* Smith also claimed difficulty sleeping. *Id.* Dr. Woodward noted that Smith had tenderness over the right iliac screw head by palpation,

---

[10] The record indicates that also on April 25, 2014, Dr. Woodward planned to telephone Smith to recommend the use of a bone growth stimulator for three months to treat the source of his symptoms, which Dr. Woodward thought was either the failure of solid fusion or a prominent or irritated right iliac screw. Filing No. 8-9 at 370.

and that he attained only minimal relief from the injection.  *Id.* at 374.  Dr. Woodward stated that perhaps Smith's symptoms were generated by pseudoarthrosis at L4-5.  *Id.* Dr. Woodward planned to monitor Smith's condition following the injection over the following days and stated that symptom improvement would warrant a repeat injection (versus removal of the right iliac screw, versus attention to the pseudoarthrosis at L4-5).[11] *Id.*  Dr. Woodward advised Smith to continue wearing the bone growth stimulator.  *Id.*

Smith saw Dr. Woodward on December 16, 2014, approximately thirteen months after surgery.  *Id.* at 377.  Dr. Woodward noted that Smith complained of ongoing pain in his right buttock and hip area, in addition to the new onset of left thoracic pain between his shoulders.  *Id.*  Smith rated his aching, throbbing pain a severity of two out ten.  *Id.* Smith also described occasional tingling in the toes of his lateral right foot.  *Id.*  Dr. Woodward further noted that a high-resolution CT scan of Smith's lumbar spine showed "a solid spine fusion throughout the spine except at the inferior endplate of L4 to the interbody graft there [was] a radiolucent cleft indicating pseudoarthrosis at some areas" and that "the posterior portion [was] difficult to determine due to the artifact from the stainless steel implants."  *Id.* at 379.

Dr. Woodward referred Smith to Dr. John R. Massey, MD, and Smith had his first visit with Dr. Massey at the Nebraska Spine and Pain Center on February 12, 2015.  *Id.* at 382.  Dr. Massey noted that Smith had a history of right lower back pain that was also significantly painful in the upper left thoracic distribution near the margin of the lower

---

[11] On August 22, 2014, Dr. Scott A. Haughawout, DO, gave Smith an injection of Depo-Medrol 80 mg and two percent lidocaine 2 cc to alleviate lower back pain.  *See* Filing No. 8-9 at 375.  This was a larger dose than previous injections.  *See also id.* 358, 365 (occasions when Dr. Donovan injected Smith with Depo-Medrol 40 mg and .25 percent bupivacaine 2 cc).  On December 16, 2014, Smith stated that Dr. Haughawout's August 22, 2014, right iliac screw injection provided some moderate relief for a short period of time.  *Id.* at 377.

thoracic rib margins. *Id.* Dr. Massey further noted Smith's history of significant discomfort in the right iliac distribution but stated that more recently Smith's discomfort was predominant in the upper lumbar or lower thoracic distribution. *Id.* Smith described his pain as aching and burning and stated that it worsened when he sat or stood for prolonged periods. *Id.* Dr. Massey declared that Smith had a widespread history of stenosis, spinal scoliosis, and neurofibromatosis. *Id.* Smith declared that it was difficult to sleep or rest, and he inquired about potential pain management treatment options. *Id.* Dr. Massey stated that Smith's situation presented "particular challenges with respect to identifying a particular anatomic etiology for the ongoing complaint of pain." *Id.* at 385. Dr. Massey said that, in a situation such as Smith's, "both peripheral and more central nerve structures [became] involved and activated and increasingly play[ed] a more significant role in the propagation of pain." *Id.* Dr. Massey indicated the following tentative treatment plan:

> Therefore, in an attempt to ameliorate the symptoms, we need to alter the adverse neurologic function which is playing a major role. This can be accomplished but needs to be done so in a gradual and titrating fashion in order to improve the tolerability of the treatment first and then once therapeutic levels can be obtained a more likely sustainable course can be achieved.

*Id.* Dr. Massey prescribed Cymbalta 30 mg daily for seven days, increased to 60 mg daily for fourteen days. *Id.* Dr. Massey expected that the Cymbalta prescription would be "both reasonably effective and therapeutically useful." *Id.*

Smith saw Dr. Massey for a follow-up appointment on March 5, 2015. *Id.* at 387. Smith indicated that Cymbalta was beneficial, but only on an intermittent bass. *Id.* Dr. Massey noted that Smith still had "axial back pain . . . predominantly in the thoracolumbar area," that Smith experienced discomfort when he rested, and that his sleep function

remained "somewhat bothersome." *Id.* Dr. Massey prescribed Cymbalta 60 mg daily for thirty days and Lyrica 75 mg for seven days, increased to 150 mg daily for thirty days. *Id.* at 390. Smith returned to Dr. Massey on March 26, 2015, for a follow-up of lower back pain with right toe numbness. *Id.* at 392. Dr. Massey noted that Smith's pain remained intermittent and sharp, and worsened with movement or upright activity. *Id.* Dr. Massey stated that Smith experienced a significant reduction in the severity and frequency of his ongoing complaints and noted that Smith felt a sense of progress in his pain management. *Id.* at 395. Dr. Massey renewed Smith's prescriptions for Cymbalta 60 mg and Lyrica 150 mg, each daily for ninety days. *Id.*[12]

Dr. Massey referred Smith to Ms. Rachel Gusse, PT, for physical therapy evaluation. *Id.* at 397. On April 1, 2015, Smith presented before Ms. Gusse with constant pain of varying intensity over his right iliac crest region. *Id.* At the appointment, Smith rated his back-pain severity at a two out of ten, but stated that it sometimes increased rapidly to nine out of ten. *Id.* Smith stated that he could sit for sixty minutes and that standing and walking were challenges. *Id.* Ms. Gusse instructed Smith in exercises to increase his strength, flexibility, range of motion, and balance for bending, lifting, pushing, pulling, reaching, sitting, twisting. *Id.* at 399. Ms. Gusse noted that the goal of Smith's physical therapy was to develop a long-term home exercise program so Smith could eventually maintain a neutral spine position. *Id.*

---

[12] While the focus of Smith's March 26, 2015, appointment with Dr. Massey was back pain management, at the conclusion of the medical record for this visit Dr. Massey also noted that Smith complained of "some right foot pain and dorsum of the foot pain in particular great toe discomfort and middle toes some evidence to suggest a more distal L5 pattern at some point in time we could consider interventional treatment there is that persists or worsens." Filing No. 8-9 at 397.

On April 17, 2015, Dr. Taylor evaluated Smith for complaints of nausea, diarrhea, and fatigue. Filing No. 9-2 Tr. 2 at 506, 510. Dr. Taylor confirmed Smith's acquired scoliosis and clinical neurofibromatosis, and prescribed Flonase 50 mcg nasal spray and Zofran 8 mg daily for acute gastroenteritis. Id. at 506, 508.[13]

Smith returned to Dr. Woodward on May 15, 2015. Filing No. 8-9 at 401. Dr. Woodward noted that Smith still experienced dull, aching back pain in addition to numbness of his right third and fourth toes. Id. Smith stated that he was unable to tolerate Cymbalta but continued to take Lyrica, which provided only minimal pain relief. Id. Dr. Woodward advised Smith to continue use of the bone growth stimulator for two hours per day. Id. at 404.

On June 25, 2015, Smith returned to Dr. Massey and complained of constant, sharp, radiating pain and an increase in limitations on daily functioning. Id. at 406. Dr. Massey increased Smith's Lyrica dose to 200 mg daily for sixty days. Id. at 409. Smith saw Dr. Massey again on July 20, 2015, and stated that his lower back pain remained constant, dull, aching, shooting, and sharp, despite an increase in Lyrica dosage. Id. at 411. Dr. Massey noted that injections were ineffective in the past. Id. As such, Dr. Massey decided to increase Smith's Lyrica dosage to 300 mg daily for thirty days. Filing No. 9-1 at 414. Smith followed up with Dr. Massey on August 27, 2015. Filing No. 9-2 at 587. Smith reported that a combination of treatments significantly improved his lower back pain and he inquired as to long-term pain management plans. Id. Dr. Massey renewed Smith's Lyrica 300 mg daily prescription for thirty days. Id. Dr. Massey noted

---

[13] The record indicates that Smith visited Dr. Taylor at Indian Hills Physicians Clinic on a number of additional occasions for treatment of acute medical problems (e.g., congestion, sore throat, flu symptoms). See., Filing No. 9-2 at 514, 521, 563.

that Lyrica would hopefully "reduce the physiology responsible for the ongoing discomfort and therefore improve the likelihood of long-term benefit . . ." *Id.* at 589.

On November 3, 2015, Dr. Woodward evaluated Smith for continual pain in his right lower back and left lower thoracic area. Filing No. 9-3 at 607. Smith also described occasional numbness along his right lateral foot and toes that occurred after he sat for extended periods. *Id.* Dr. Woodward noted that while Smith's pain was constant, it increased after activities. *Id.* Smith stated that he had difficulty sleeping because he experienced pain when he rolled over in bed. *Id.* Dr. Woodward further noted that Smith felt fatigued after he performed activities, such as when he mowed the lawn, and he consequently had to take a two-hour nap. *Id.* Smith stated that Lyrica 300 mg did not satisfactorily alleviate his symptoms. *Id.* A CT scan of Smith's lumbar spine revealed "dural ectasia cephalad to L3." *Id.* at 609. On June 3, 2016, Smith saw Dr. Woodward again for right lower back and leg pain. *Id.* at 610. Smith stated that his pain had increased in his right lower back and buttock and into his thigh. *Id.* Smith declared that this pain was a burning, sharp sensation which worsened when he sat or stood for prolonged periods, and he described the pain as different than the pain for which he regularly visited Dr. Massey. *Id.* Dr. Woodward noted that Smith rated his leg pain severity at a four out of ten and his back-pain severity at a two out of ten. *Id.* Dr. Woodward noted that Smith was prescribed Lyrica 200 mg daily and Nortriptyline HCl 50 mg daily, and Dr. Woodward additionally prescribed Indomethacin ER 75 mg daily. *Id.* at 612.

Smith went to ACH Lakeside Hospital on November 11, 2016, with complaints of abdominal pain. Deanna M. Armstrong, MD, ordered a "CT Abdomen Pelvis with IV Contrast," which revealed an abdominal wall hernia. Filing No. 9-4 at 623.

Dr. Woodward referred Smith to Dr. M. Andrew Thompson, MD, at OrthoWest. Filing No. 9-3 at 599. On December 5, 2016, Dr. Thompson evaluated Smith for right hand numbness. *Id.* Dr. Thompson noted that Smith had a month-long "history of catching and occasional locking in the middle finger," in addition to "pain in the A1 pulley." *Id.* Dr. Thompson injected Smith's right middle finger with Celestone and lidocaine. *Id.* at 601.[14]

On December 14, 2016, Smith saw Ms. Kelly Crichton, PT, and began aquatic physical therapy at ACH Lakeside Wellness Center. Filing No. 9-4 at 624. Ms. Crichton noted that Smith had several deteriorating discs and too much spinal fluid. *Id.* at 625. Smith stated that, on worse days, his pain severity was a five or a six out of ten, and that he sought aquatic physical therapy with the goal of getting back to work or increasing his activity tolerance. *Id.* Ms. Crichton stated that aerobic activity would improve Smith's endurance for tolerance of daily activities, and that the buoyancy of the water would decrease strain on Smith's joints, consequently decreasing pain and increasing exercise tolerance. Filing No. 9-4 at 626. She thought that the warmth of the water would decrease tightness and increase flexibility, and the resistive properties of the water would increase core strength and lower extremity stability. *Id.*[15]

---

[14] On April 20, 2017, Dr. Thompson performed outpatient "trigger release" surgery on Smith at Nebraska Orthopaedic Hospital. *See,* Filing No. 9-5 at 694-696. On April 28, 2017, Dr. Thompson noted that Smith had healed well. *Id.* at 688.

[15] The record indicates that Smith continued physical therapy with seventeen more treatments throughout late 2016 and early 2017. *See* Filing No. 9-4 at 628, 630, 633, 635, 636, 639, 641, 643, 646, 648, 650, 653, 655, 657, 660, 662, 665.

On December 19, 2016, Dr. Joel Cotton, MD, conducted an electromyograph ("EMG") to evaluate Smith for potential carpal tunnel syndrome. Filing No. 9-3 at 603. Dr. Cotton noted that the EMG and nerve conduction study of Smith's right upper extremity demonstrated evidence of a right distal median neuropathy "as may be seen clinically in moderate right carpal tunnel syndrome." *Id*.

On January 6, 2017, Smith visited Dr. Taylor for a pre-operative exam about two weeks before a scheduled growth removal surgery. Filing No. 9-6 at 733. His daily medications at the time were fluticasone, diazepam, indomethacin, nortriptyline, and pregabalin (Lyrica). *Id*. at 734-735. On January 19, 2017, Dr. Armstrong removed scar tissue from Smith's left medial eye and a 1.9 cm nasal lesion, both a result of neurofibromatosis. Filing No. 9-4 at 681.

On February 9, 2017, Smith followed up with Dr. Massey after he completed the recommended physical therapy treatment course. Filing No. 9-7 at 809. Dr. Massey noted that physical therapy improved Smith's stamina and flexibility, but not his pain. *Id*. at 811. In addition to continuous back pain, Smith also complained of left knee weakness, so Dr. Massey suggested that he see an orthopedic surgeon. *Id*.[16] Smith said that his medication regimen provided at least some pain management benefit, so Dr. Massey again prescribed Indomethacin 75 mg daily, Lyrica 200 mg daily, and Nortriptyline HCl 50 mg daily. *Id*.

On May 25, 2017, Smith saw Dr. Jeremiah P. Ladd, MD, at the Nebraska Spine and Pain Center. *Id*. at 803. Smith reported cervical thoracic pain and constant sharp,

---

[16] On February 20, 2017, Smith saw Dr. Mark F. Goebel, MD, at OrthoWest for evaluation of left knee pain. Filing No. 9-6 at 720. An x-ray showed "minimal to subtle mild osteoarthritic change in [Smith's] knees, left greater than right," "mild patella inferior and superior-posterior osteophyte formation," and some degree of arthritic change in his knees. *Id*. Dr. Goebel recommended strengthening via bike riding or swimming. *Id*.

burning right lower back pain that radiated around the iliac crest. *Id.* Dr. Ladd also noted right lower cervical spine pain, left trapezius stiffness, and right buttock pain. *Id.* Dr. Ladd stated that Smith appeared uncomfortable – that he frequently changed positions and leaned to the right when he sat. *Id.* at 805. Dr. Ladd determined that, given Smith's extensive history of spinal surgery, it was best to "continue to focus on the noninvasive conservative care efforts to try and help [Smith] from a pain control and functional mobility standpoint," so he decided to continue Smith on the same doses of Indomethacin ER, Nortriptyline HCl, and Lyrica. *Id.* at 806.

On June 26, 2017, Dr. Taylor asserted that Smith suffered from "marked pain and disability regarding his thoracolumbar spine challenges." *Id.* at 814. Dr. Taylor stated that Smith developed substantial complications from a L4-SI fusion, which included "neuropathic degeneration of the oblique muscles of the left lateral abdomen." *Id.* Dr. Taylor declared that Smith's substantial back pain markedly created a distraction for his concentration and required him to frequently change positions. *Id.* Dr. Taylor maintained that Smith could sit in an office chair for no longer than twenty to thirty minutes before he needed to change positions, he required "frequent changes in position to accommodate back pain while sitting such as transient standing or even requiring reclining," and he had to nap for at least one hour per day. *Id.* Further, Dr. Taylor contended that Smith could not work eight hours per day, five days per week, on a regular continued basis "because of his degree of debility secondary to his spinal condition, which he has undergone multiple surgical procedures and continues to have pain despite his treatment." *Id.* Dr. Taylor insisted that Smith would miss more than three days of work per month and stated

that his limitations were longstanding, complicated by attempts at previous correction, and would extend in the future.  *Id.* at 815.

On July 1, 2017, while doing stretching exercises for pain management, Smith "felt acute onset of pain, an expanding mass in the left flank and presented to the emergency room" at ACH Lakeside Hospital.  Filing No. 9-8 at 817.  A CT scan revealed a large expanding hematoma with active bleeding, so Dr. Roalene J. Redland, MD, operated on an emergent basis.  *Id.*  Dr. Redland removed the hematoma and Smith "left the operating room in good condition."  *Id.* at 818.  Dr. Jeremy F. Lee, DO, prescribed tramadol up to 200 mg daily for ten days.  *Id.* at 829.  Smith was discharged on July 2, 2017.  Filing No. 9-10 at 978.

Two consulting doctors were retained by the defendant.  Filing No. 8-3 at 68-78 and 80-89.  Neither consultant examined Smith.  Their opinions were based upon a review of available medical records.  The record does not identify the medical specialties nor the level of orthopedic/neurologic expertise for either consultant.  Both consultants concur with the medical diagnosis given by the treating physicians.  Dr. Roth's consultation was on September 15, 2015 based on records up to July 30, 2015.  *Id.* 73.  Dr. Reed's consultation refers to records as late as August 27, 2015.  *Id.* at 84.  Both consultants find severe impairment for back disorder, discogenic and degenerative, curvature of the spine and other diseases of the back.  *Id.* at 73 and 85.  Dr. Roth opines Smith may get better and will be able to perform sedentary work.  *Id.* at 78.  Dr. Reed simply states that Smith is not so severe as "to prevent you from performing all job tasks."  *Id.* at 89.

### D. The ALJ's Findings

The ALJ found that Smith was not disabled. Filing No. 8-2 at 22. The ALJ undertook the standard five-step sequential process for analyzing and determining disability. *Id.* at 15-22. The ALJ found that Smith had not engaged in substantial gainful activity since the alleged onset date of October 31, 2013. *Id.* at 15. The ALJ agreed with the finding that Smith suffered from degenerative disc disease and scoliosis of his spine, post-fusion, neurofibromatosis, and carpal tunnel syndrome of his right upper extremity, and that all of these impairments were severe. *Id.* at 15-16.

The ALJ concluded that Smith's impairments or combination of impairments did not meet or medically equal the severity of any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526), so as to render Avant presumptively disabled. *Id.* at 16-17. The ALJ found that the record of Smith's degenerative disc disease and scoliosis did not effectively demonstrate nerve root or spinal cord compromise with nerve root compression, spinal arachnoiditis, or pseudoclaudication in accord with the mandates of 1.04. *Id.* at 16. The ALJ also found that neither Smith's carpal tunnel syndrome nor neurofibromatosis medically equaled a listing. *Id.* at 16-17.[17]

---

[17] Neither carpal tunnel syndrome nor neurofibromatosis were listed impairments. The ALJ used listings 11.02C and 1.00B as guides when he evaluated Smith's carpal tunnel syndrome. Listing 11.00C, as related to carpal tunnel syndrome, required documented evidence of persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, or ataxia and sensory disturbances, or interference with the use of fingers, hands, and arms. Filing No. 8-2 at 16. Listing 1.00B required documented evidence that the claimable was unable to use upper extremities to effectively carry out activities of daily living. *Id.* The ALJ concluded that Smith's medical records did not demonstrate clinical findings that showed he had persistent disorganization of motor function or was otherwise unable to use his upper extremities effectively. *Id.* The ALJ evaluated Smith's neurofibromatosis under Appendix 1 and found that Smith's neurofibromatosis did not equal a listing because "the record does not contain evidence from a state agency medical or psychological consultant, a medical expert, or a member of the Appeals Council medical support staff that would support a finding of medical equivalence." *Id.* at 17.

The ALJ determined that Smith had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a). *Id.* at 17. The ALJ added the following limitations to Smith's capability to perform sedentary work: Smith required five minutes out of each hour to stand at his work station, in addition to regular breaks; he could frequently finger and handle with his right upper extremity; he could occasionally climb stairs or ramps, balance, kneel, stoop, crouch, and crawl; he had to work in an environment free from exposure to vibration or workplace hazards (i.e., unprotected heights or close proximity to dangerous moving mechanical parts); and he could not climb ropes, ladders, or scaffolds. *Id.*

The ALJ acknowledged that Smith's medically determinable impairments could have reasonably produced his symptoms. *Id.* at 18. However, the ALJ did not afford great weight to Smith's testimony because his "statements concerning the intensity, persistence and limiting effects of those symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . ." *Id.* As such, the ALJ allowed Smith's statements to affect his ability to work only insofar as they were consistent with objective medical and other evidence. *Id.*

The ALJ granted diverging weights to the medical opinions of Dr. Edward Taylor, Smith's primary treating physician. *Id.* Dr. Taylor stated that Smith needed to change positions after he sat for twenty to thirty minutes, and that he required frequent changes in posture whether he stood, sat, or reclined. *Id.* The ALJ allotted some weight to this part of Dr. Taylor's medical opinions because "a requirement that the claimant be allowed to change postures [was] consistent with the state's medical consultants' opinions and the medical evidence generally." *Id.* Additionally, Dr. Taylor opined that Smith needed

to nap at least one hour per day, that he could not work an eight-hour workday, and that he would miss more than three days of work each month. *Id.* When he determined the limitations included in Smith's RFC, the ALJ gave this portion of Dr. Taylor's opinion little weight, as he found that such limitations were unsupported by other objective medical evidence in the record. *Id.*

The ALJ gave some weight to the opinions consulting state medical non-examiners. *Id.* These consultants never met Smith, but they performed a comprehensive analysis of his medical records, and they consequently opined that Smith could perform sedentary work with some exertional, postural, and environmental limits, and that he could sit for six hours out of an eight-hour workday. *Id.* The ALJ afforded some weight to the consultants' opinions because they were "supported by the objective medical evidence in its entirety." *Id.* The ALJ noted that the state medical consultants failed to address the assertion that Smith needed to stand for five minutes each hour, but that this claim was "reasonably supported by the evidence of his spinal surgery," so he incorporated this limitation into Smith's RFC determination. *Id.*

On August 18, 2015, Smith's wife, Lynette Smith, completed a supplemental informational form regarding her first-hand experience of Smith's severe impairments. Filing No. 8-7 at 220-222. The ALJ stated that Mrs. Smith's written statement did "not report significant limits on the claimant's activities of daily living," so he determined that her opinion supported his RFC finding. Filing No. 8-2 at 19. As such, the ALJ afforded Mrs. Smith's statement some weight "as to [the] nature, severity, and limiting effects of the claimant's impairments" because it was "generally consistent with the medical evidence on the record." *Id.*

The ALJ asserted that his RFC assessment of Smith was sustained by the opinions of the state medical consultants, by Smith's own testimony regarding his ability to sit, his post-surgical diagnostic scans, his continuing "conservative" medical treatments, and by the record as a whole. *Id.* at 20. The ALJ acknowledged that Smith experienced back discomfort but insisted that "the overall evidence of record indicate[d] that [Smith's] pain [was] not so severe as to prevent him from performing work at this level." *Id.*

### E. Vocational Expert's Relevant Testimony at the ALJ Hearing

A vocational expert also testified at the hearing. Filing No. 8-2 at 57-65.[18] She addressed the issue of whether a worker with at least a high school education could either go back to past work as a fraud agent, expense clerk, document preparer, or mailroom clerk, or could perform other sedentary work. *Id.* at 57-58. The vocational expert was asked to assume that the claimant was limited to sedentary work without climbing of ropes, ladders, or scaffolds; only occasional climbing of ramps and stairs, balancing, kneeling, stooping, crouching and crawling; and no concentrated exposure to vibration and workplace hazards (i.e., unprotected heights or close proximity to dangerous moving mechanical parts). *Id.* at 57. The vocational expert testified that, with those restrictions, the claimant retained the ability to perform past work as either an expense clerk, fraud clerk, or document preparer, but was precluded from past work as a mailroom clerk. *Id.* She further testified that the above restriction left other sedentary, unskilled jobs in the national economy that the hypothetical claimant could perform: charge account clerk callout operator, or addresser. *Id.* at 58. The vocational expert estimated that there

---

[18] The vocational expert's testimony began with replies to the ALJ's inquiries. Filing No. 8-2 at 57-61. The second part of the vocational expert's testimony was in response to questions from Smith's attorney. *Id.* at 61-65.

existed 30,000 charge account clerk positions and 11,000 callout operator and addresser positions in the national economy. *Id.*

The vocational expert was then asked to assume that the hypothetical claimant with all of the above restrictions could perform no more than frequent fingering and handling with the right upper extremity. *Id.* at 59. With this altered hypothetical, the vocational expert testified that the claimant could still perform past work as an expense clerk, fraud clerk, or document preparer, and could potentially find work in the national economy as a charge account clerk, callout operator, or addresser. *Id.* The vocational expert was then asked to assume the claimant had the same restrictions as in both the first hypothetical and the altered hypothetical. *Id.* at 60. In addition, the claimant needed to stand for five minutes every hour and take regular breaks but did not need to leave the workstation or work area. *Id.* The vocational director testified that in this situation, as in the first altered hypothetical, the claimant could work as an expense clerk, fraud clerk, document preparer, charge account clerk, callout operator, or addresser. *Id.*

Then, the vocational expert was asked to assume the claimant in the first hypothetical situation was limited to sitting no more than twenty to thirty minutes in an office chair before the claimant needed to change positions to accommodate back pain, and then was required to stand for approximately five minutes before he could sit down again. *Id.* at 61. The vocational expert testified that, in this situation, the hypothetical claimant would be "unable to sustain a competitive level of productivity," so competitive employment was precluded. *Id.* at 62. The vocational expert was then asked to assume the claimant in the first hypothetical situation required a forty-five-minute nap four to five days per week. *Id.* The vocational expert stated that such an individual could only

maintain competitive employment if the forty-five-minute nap took place during lunch, or else the nap would be an unscheduled break that precluded competitive employment. *Id.* The vocational expert affirmed that she was unaware of any existing regulations that required an employer to provide forty-five-minute lunch breaks, so if the hypothetical claimant's nap took place outside of a scheduled lunch break, the claimant could not maintain competitive employment. *Id.* at 62-63.

Next, the vocational expert was instructed to further alter the potential situation such that the hypothetical claimant was limited to only occasional handling on the right-dominant hand. *Id.* at 64. In such a situation, the vocational expert testified that there existed only two sedentary, unskilled jobs the individual could perform in the national economy. *Id.* She affirmed that, when handling can only be occasional, ninety-eight percent of sedentary, unskilled jobs were precluded, and that such job base was effectively eroded. *Id.* at 65. Finally, the vocational expert testified that if a hypothetical claimant missed more than three days of work per month, the claimant would be unable to maintain employment. *Id.*[19]

### F. Issues on Appeal

In this appeal, Smith alleges: (1) that the ALJ did not provide good reasons for the weight afforded to the treating physician opinions of Dr. Taylor or to Smith's subjective reports of limitations; (2) that the ALJ's RFC determination is not supported by sufficient medical opinion evidence as it relates to Smith's sitting and other limitations; and (3) that

---

[19] After the vocational expert's testimony, at the conclusion of the hearing, the ALJ gave Smith an opportunity to relay additional information. *See* Filing No. 8-2 at 66-67 (Smith stated, inter alia, that despite consistent medical treatment following the October 31, 2013, surgery, he still experienced back pain and back problems such that he could not lift heavy objects, bend, or sit for prolonged periods of time, and consequently he was physically unable to work at any job, even though he wanted to get back to work).

the ALJ was an inferior officer not appointed in a constitutional manner, which requires the ALJ's decision to be vacated and Smith's claim remanded to be decided by a new ALJ that was constitutionally appointed.[20]

## II. DISCUSSION

### A. Law and Analysis

#### 1. Standard of Review

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence means something less than a preponderance of the evidence, but more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moore v. Astrue,* 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d

---

[20] This Court has already decided the issue of whether an ALJ is an inferior officer not appointed in a constitutional manner. *See* Filing No. 13, *Hernandez v. Berryhill*, No. 8:18CV274 (Neb. Mar. 14, 2019) ("The court finds that [the claimant's] argument that the ALJ was an inferior officer not appointed in a constitutional manner is untimely. While [the claimant] argues that the claim was not forfeited or waived even though it was not presented to the ALJ . . . this argument is unpersuasive.").

818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).

### 2. Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that his or her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.* If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and

others, and the claimant's own descriptions of his or her limitations.  *Papesh v. Colvin,* 815 F.3d 1126, 1131 (8th Cir. 2015).  The RFC must (1) give appropriate consideration to all of a claimant's impairments; and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting.  *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).  At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work.  *Cuthrell*, 702 F.3d at 1116.  If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform.  *Id.; see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

This Court finds that Smith qualifies for benefits based on the Social Security Administration's sequential process, which automatically supports a finding of disability. At step 1, Smith has not engaged in substantial gainful activity since the alleged onset date of October 31, 2013.  At step 2, the combination of Smith's degenerative disc disease, scoliosis, neurofibromatosis, dural ectasia, carpal tunnel syndrome, and post-surgical back complications are medically determinable physical impairments which limit his ability to perform basic work activities.  Smith's impairments are at or near listing-level severity so as to render him presumptively disabled at step 3.  Even if Smith's impairments did not meet the severity of a listed impairment, the ALJ incorrectly determined Smith's RFC at step 4 because, when he established the physical activity that Smith could perform in a work setting, he discounted both the objective and subjective medical evidence in the record.  This error consequently caused the ALJ to determine, at step 5, that Smith could

perform both past work and other jobs in the national economy. This Court finds that the five-step analysis renders Smith disabled.

However, the Court will address the remaining issues below, which also clearly demonstrate a finding of disability.

### 3. Weight Afforded to Treating Physician's Opinion

The ALJ must give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Papesh*, 786 F.3d at 1132. Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Id.* The regulatory framework requires the ALJ to evaluate a treating source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *Id.; see* 20 C.F.R. 404.1527(c)(2). "When an ALJ discounts a treating [source's] opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Jenkins v. Apfel*, 196 F.3d 922, 924-925 (8th Cir. 1999) (stating the ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions).

The ALJ failed to properly credit the opinions of Smith's primary treating physician. The ALJ did not give controlling weight to the treating physician and did not provide adequate reasoning for failing to adopt what the record demonstrates is an informed, reliable opinion from an adept medical doctor. There is substantial evidence from Smith's

treating physician that he suffers from physical impairments (i.e., chronic back pain) that interfere with his ability to work. The opinions presented by the Commissioner's consulting physicians do not counter these opinions. In this case, the ALJ did not properly assess the weight of the treating physician's opinions. The ALJ did not comply with requirements to consider the length of the physician's treatment (the record indicates at least over four years of treatment at the time of the hearing), frequency of examination (the record indicates at least nine office visits), nature and extent of the treatment relationship (primary care internist who demonstrated knowledge of and familiarity with Smith's disabling condition), support of opinion afforded by medical evidence (objective medical records establish the credibility of the treating physician's opinion) consistency of opinion with the record as a whole (the physician's opinion that, inter alia, Smith could sit in an office chair for no more than twenty to thirty minutes, needed to change positions frequently, was fatigued and needed to nap deserve controlling weight because they are not inconsistent with anything in the record), and specialization of the treating source (the treating source is an internal medicine specialist who chronicled Smith's numerous, substantial complications following spinal fusion surgery).

This Court finds that Smith is clearly disabled, and the ALJ failed to give controlling weight to Smith's treating physician's opinion. The professional opinions of Smith's internal medicine practitioner were consistent with other substantial evidence within the record and were well-supported by medically acceptable clinical and laboratory techniques. The record does not support a finding that Smith can work as described under the Social Security regulations. In fact, the record indicates quite the opposite: substantial evidence demonstrates that Smith's persistent, immobilizing back pain

constitutes an impairment that precludes gainful employment. Since the ALJ discounted credible, informed medical assessments contained in the record, this court finds Smith disabled. These findings are clearly supported by the medical records and by his treating physicians.

### 4. Weight Afforded to Smith's Subjective Reports of Limitations

When assessing the credibility of a claimant's subjective allegations, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Tate v. Apfel*, 167 F.3d 1191, 1197 (8th Cir. 1999) (applying analysis mandated by *Polaski v. Heckler*, 739 F.2d 1120, 1322 (8th Cir. 1984), to seizure complaints). "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)). A claimant may have disabling pain and still be able to perform some daily home activities. *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."); *see also Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

In denying Smith's claim, the ALJ discounted Smith's subjective complaints of severe pain. The objective medical evidence supports Smith's subjective allegations about the frequency and severity of intense back pain. Although the diagnoses on the record of neurofibromatosis, scoliosis, hematomas, dural ectasia (compounded with medication, surgical, and physical therapy treatment for chronic back pain) reveal that

Smith consistently sought treatment for relief of his symptoms; there is nothing in the record to show that any type of medical intervention would remedy Smith's conditions. As such, Smith's testimony and medical records leave little doubt that his treating physicians regarded his condition as intractable, so the ALJ's opinion wrongly relied on a presumption of efficacious treatment.

In the analysis of Smith's subjective complaints, the ALJ did not consider all of the relevant factors. For example, the ALJ failed to analyze Smith's work history in the context of his impairments. Smith's strong work history is consistent with his stated desire to work. With the exclusion of a couple of years, Smith's earnings report reflected an employment history that provided steady, sufficient wages from 1982, when Smith started working, until 2013, when he underwent a surgery with longstanding ramifications that continue to render him unable to work. This, and other evidence on the record, coupled with Smith's testimony, indicates that Smith possesses a strong work ethic and an eagerness to be a contributing member of the workforce.

The ALJ further erred in determining that a finding of disability was precluded by Smith's daily activities. The ALJ relied on the testimony that Smith was well-groomed, showered daily, got his two young children up and dressed, prepared meals for his family and himself, drove his children to and from school, occasionally shopped, and completed some light housework. These activities are not inconsistent with severe pain. Rather, the evidence shows that Smith's activities are limited by his pain. The details of Smith's difficulties with daily activities (e.g., he tried to mow the lawn and could not) support, rather than detract from, his credibility with respect to disabling impairments. The ALJ placed an inordinate emphasis on Smith's candid admission that he was reluctant to habitually

consume opioid medications for chronic pain management. That admission does not signal that Smith is able bodied. This Court holds that Smith is presumptively disabled because the ALJ's reasons for discrediting Smith's testimony are not adequate to offset the substantial evidence on the record which supports Smith's subjective complaints of pain and, therefore, a finding of disability.

### 5. RFC Unsupported by Sufficient Medical Opinion Evidence

In order to be supported by substantial evidence, an ALJ's RFC finding must be supported by a treating or examining source opinion. *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *see also Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007). "To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'" *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). In instances where there is no treating or examining source opinion in the record, the ALJ cannot rely on his or her own inferences when weighing the available opinion evidence. *See Combs v. Berryhill*, 878 F.3d 642, 647-648 (8th Cir. 2017).

The ALJ erred because when he determined Smith's RFC, he relied on his own inferences rather than the medical evidence in the record. The ALJ reasoned that Smith had satisfactory spinal fusions and normal x-rays and exams by November of 2015, so there was no objective medical evidence in the record to support Smith's claim that he could not sit or stand for prolonged periods. The last non-examining medical consultant's review was on November 5, 2015, which was an incomplete, insufficient source of information for the ALJ, as the medical record throughout 2016 clearly illustrates the progression of the symptoms of Smith's disabling condition. The ALJ should have relied

upon the treating physician's review and analysis of Smith's conditions. Since assessments of a non-treating physician alone are not substantial evidence if a treating physician provides a conflicting assessment, this court holds that Smith is disabled.

## III.     CONCLUSION

The clear weight of the evidence points to a conclusion that Smith has been disabled since his alleged onset date of October 31, 2013. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. *See Hutsell v. Massanari*, 259 F.3d 707, 709 (8th Cir. 2001). Accordingly,

IT IS ORDERED that the plaintiff's motion to reverse (Filing No. 12) is granted; that the defendant's motion to affirm (Filing No. 15) is denied; that the decision of the Commissioner is reversed; and that this action is remanded to the Social Security Administration for an award of benefits.

Dated this 30th day of August 2019.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge